UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Christopher J. Davis,

     Plaintiff,

     v.                                 Civil Action No. 2:17-cv-54-jmc

Commissioner of Social Security,

     Defendant.

## OPINION AND ORDER
(Docs. 13, 16)

Plaintiff Christopher J. Davis brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Pending before the Court are Davis's motion to reverse the Commissioner's decision (Doc. 13), and the Commissioner's motion to affirm the same (Doc. 16). For the reasons stated below, Davis's motion is DENIED, and the Commissioner's motion is GRANTED.

## Factual Background

Davis was 29 years old on his alleged disability onset date of June 30, 2003. He graduated from high school and worked in the following jobs, each for only a short period of time: a cashier at a convenience store, a short order cook, a housekeeper/ janitor, and a seasonal worker at a ski resort. He is married and has two daughters, approximately ages nine and sixteen, who he helped care for during the relevant

period. He also has an older daughter who he gave up for adoption when she was a young child.

Davis had a difficult childhood marked by abuse, limited social relationships, lack of stability, and behavioral problems. (AR 305, 862, 1494–95.) When he was a young child, Davis was physically and sexually abused by his parents. He and his sister were removed from the family home when Davis was six years old, and he spent the rest of his childhood in state custody. Though his sister was adopted, Davis had multiple placements in foster homes and youth centers, and several admissions to mental health and addiction hospitals primarily due to his conduct-related issues. Davis also spent time in prison for committing petty theft as a child and check forgery as an adult; and he served a long period of house arrest, ending in November 2009, due to a charge of occupied burglary. (*See* AR 224, 301, 305, 554, 729, 1623, 1625, 1627–33.)

In 2006, Davis married his current wife, Mandy Davis, who has testified at multiple administrative hearings in support of Davis's disability application. A November 2006 medical report states that, on a typical day during the alleged disability period, Davis helped prepare his daughter for school, used the computer, cooked, attended to his personal care, and did chores. (AR 302.) A psychological report from November 2007 indicates that Davis was "an at-home father" and "the primary caregiver for his two children[,] as his wife [was] work[ing] full time outside of the home." (AR 307.) In February 2007, Davis reported that he spent five to six hours a day in front of a computer (AR 346); and in April 2007, he reported spending ten to

twelve hours a day engaged in that activity (AR 337).  In June 2007, Davis was "working as a cook at a local restaurant, which [required] him to stand [for] [eight] to [ten] hours per day."  (AR 334.)  By July 2008, however, Davis stated in a Function Report that he did not leave the house other than for medical appointments because he was on house arrest; the heat bothered him; and he found it hard to breath. (AR 189.)  He stated that, on a typical day, he drank coffee, smoked cigarettes, cleaned the house, helped his wife with their kids, and "buil[t]/tinker[ed]/play[ed] on computers."  (AR 186.)  He stated that sometimes he did nothing all day except "escape in my computer work" (*id.*), and that he was "agitated all the time" and did not get along with people (AR 191).

In December 2009, Davis testified that he was the primary caretaker of his children and that Mandy worked outside the home doing graphic design for a newspaper.  (AR 1210.)  In December 2011, Mandy testified that Davis watched their daughters (ages two and nine at the time) only on Sunday and Monday evenings while Mandy worked (AR 2499); and he watched television and slept most of the day (AR 2497; *see* AR 2672, 2685 (Davis and Mandy testifying in September 2013 that Davis watched television for much of the day)).  Mandy further testified that, although prior to December 2011, Davis cared for their girls more frequently and did housework while she was at work, his depression had worsened so that he did not do much of that anymore.  (AR 2500–01.)

In September 2013, Mandy testified that the family had received state subsidized childcare from 2008 through April 2013 because she was working and

Davis "had mood instability and could not care for the kids full[]time." (AR 2678.) Mandy further testified that Davis had cared for their younger daughter in 2009, but that lasted only "a couple weeks" because "he was clearly not able to and [they therefore] found daycare." (*Id.*) Mandy explained that Davis was "fine" in emergencies but he did not interact with their children; he was "hostile" with their older daughter; and he had "violent thoughts towards" their younger daughter. (*Id.*) In August 2016, Mandy testified that Davis could not care for their children due to his anxiety and anger outbursts. (AR 2393.) She explained that he has "a very hard time trying to remain unemotional and unreactive when it comes to parenting." (*Id.*) Nonetheless, Mandy stated that Davis stayed home with the children three days a week while she worked, although they were older and did not require much supervision anymore. (AR 2394.) During a typical day, Mandy stated that Davis did some household chores like the dishes and laundry, fed their pets, and tinkered on electronics; on some days, however, she said he did nothing all day. (AR 2397.) Mandy also noted that sometimes Davis went to the thrift shop and "talk[ed] to the old ladies down there" while looking for free electronics. (AR 2399.)

Overall, the record reflects that Davis has anti-social tendencies. (*See, e.g.*, AR 931.) He appears to have close relationships with only his wife and his sister; and he leaves the house only occasionally (he does not have a driver's license). He has had longstanding difficulties with interpersonal interactions and anger management; and he suffers from mood disorders, depression, anxiety, and impulse control. (AR 862, 1495.) He also suffers from many physical impairments, including a pulmonary

4

embolism, deep vein thrombosis, degenerative disc disease, ulnar nerve neuropathy, carpal tunnel syndrome (CTS), and obesity.  Despite these impairments, in August 2016, Davis testified that he regularly attends church (AR 2403), "tinker[s]" on and fixes electronics for people (AR 2405), and does chores around the house (*id.*).  He explained that he stopped working because his most recent jobs were seasonal (AR 2406), because his employer "didn't want to keep [him] on" (*id.*), or because of his pulmonary embolism (AR 2407).  Additionally, he explained that he "[d]oesn't get along with . . . boss[es] telling [him] what to do." (*Id.*)  He further testified that he was thinking about going back to vocational rehabilitation but was deterred because "they won't help me until I get help myself."  (AR 2408.)

## Procedural Background

On October 18, 2007, Davis filed applications for DIB and SSI, alleging that, starting on June 30, 2003, he has been unable to work due to emotional disorders and attention deficit disorder.  (AR 116.)  He explained that he has difficulty focusing at work, irritability, problems with relationships and getting along with others, depression, impulsivity, and paranoia.  (*Id.*)  Davis's applications were denied initially and upon reconsideration, and he timely requested an administrative hearing.  The hearing was conducted on December 14, 2009 by Administrative Law Judge (ALJ) Ruth Kleinfeld.  (AR 1273–88.)  On April 29, 2010, the ALJ issued a decision finding that Davis was not disabled under the Social Security Act at any time from his alleged disability onset date through the date of the decision.  (AR 4–21.)  Davis timely appealed that decision to the district court, and the parties stipulated to a reversal

and remand for a new hearing and decision. On April 20, 2011, the Appeals Council remanded the case with instructions. (AR 1160–66.)

On December 7, 2011, a second administrative hearing was held before ALJ Kleinfeld (AR 2471–2518), who issued a second unfavorable decision on January 27, 2012 (AR 1179–1202). Davis again appealed, and on June 13, 2012, the Appeals Council vacated and remanded the ALJ's decision with instructions. (AR 1171–75.)

On September 30, 2013, a third administrative hearing was held, this time before ALJ Thomas Merrill. (AR 2666–94.) On December 13, 2013, ALJ Merrill issued a third unfavorable decision. (AR 947–74.) Davis timely appealed the decision to the district court, ultimately resulting in a June 3, 2015 Order from the Appeals Council remanding the case, yet again, with instructions. (AR 2463–67.)

On August 23, 2016 and October 12, 2016, respectively, fourth and fifth hearings were held on Davis's claim, this time before ALJ Dory Sutker. (AR 2379–2410, 2412–61.) Medical expert psychiatrist Dr. Nathan Strahl testified by telephone at the October 2016 hearing. (AR 2423–50.) On January 3, 2017, the ALJ issued a decision finding that Davis had not been disabled from his alleged disability onset date of June 30, 2003 through the date of the decision. (AR 2346–63.) Thereafter, the Decision Review Board did not complete its review of the claim during the time allowed, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–3.) Having exhausted his administrative remedies, Davis filed the Complaint in this action on March 31, 2017. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show

that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis in her January 3, 2017 decision, ALJ Sutker first determined that Davis had not engaged in substantial gainful activity since his alleged disability onset date of June 30, 2003. (AR 2349.) At step two, the ALJ found that Davis had the following severe impairments: recurrent idiopathic pulmonary embolism and deep vein thrombosis, degenerative disc disease of the spine, ulnar nerve neuropathy (left), CTS, obesity, dysthymic disorder, anxiety disorder, a personality disorder, and a history of attention deficit hyperactivity disorder. (*Id.*) Conversely, the ALJ found that Davis's pilonidal cyst, esophageal reflux, and sleep apnea were non-severe impairments. (AR 2351.) At step three, the ALJ found that none of Davis's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 2351–56.)

Next, the ALJ determined that Davis had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except as follows:

> [Davis] cannot climb ladders/ropes/scaffolds[,] and he is limited to occasional climbing of stairs/ramps, kneeling, crouching, crawling[,] and stooping. He needs to avoid exposure to unprotected heights and to dangerous machinery. He can perform uncomplicated tasks that typically can be learned in 30 days or less. He can maintain concentration, persistence[,] and pace for such tasks for 2-hour blocks throughout an 8-hour workday with regular scheduled breaks and lunch. He is limited to incidental contact with the general public (dealing with the public is not part of his job duties). He needs an environment where tasks are

performed in a solitary manner (no tandem or team tasks), but he is able to collaborate with co[]workers and supervisors on routine matters.

(AR 2356.)  Given this RFC, the ALJ found that Davis was unable to perform any of his past relevant work.  (AR 2361.)  Finally, based on testimony from vocational expert Dr. Peter Manzi, the ALJ determined that Davis could perform other jobs existing in significant numbers in the national economy, including the representative occupations of assembler of hospital products, assembler of small products, and lens matcher.  (AR 2362.)  The ALJ further found that, even if Davis were limited to only frequent handling and fingering, he could perform work as an assembler of hospital products, a lens matcher, or a weld inspector.  (*Id.*)  The ALJ concluded that Davis had not been under a disability from the alleged disability onset date of June 30, 2003 through the date of the decision.  (AR 2363.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Davis argues that the ALJ erred in her analysis of the medical opinion evidence; in her determination of Davis's RFC; and in her assessment of Davis's credibility. (Docs. 13, 17.) He further argues that the ALJ improperly failed to follow the Appeals Council's June 3, 2015 Remand Order. (*Id.*) In response, the Commissioner claims that the ALJ's decision is supported by substantial evidence and free of legal error.

(Doc. 16.)  As explained below, the Court agrees with the Commissioner and finds that the ALJ's decision applies correct legal standards and is supported by substantial evidence.

## I.  ALJ's Analysis of Medical Opinion Evidence and RFC Determination

Davis contends the ALJ erred in her analysis of the medical opinion evidence and determination of Davis's RFC.  Davis's primary dispute is with the ALJ's assessment of Davis's ability to work despite his limitations in interacting with coworkers, supervisors, and the general public.  According to Davis, there is substantial evidence, including medical opinion evidence, indicating that Davis's mental impairments precluded him from being able to work during the alleged disability period.  But the Commissioner correctly asserts that, whether there is substantial evidence supporting Davis's view is not the issue; rather, the Court must decide "whether substantial evidence supports *the ALJ's decision.*"  *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (citing *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) ("If there is substantial evidence to support the [ALJ's] determination, it must be upheld."); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (limiting court's review to "determining whether the SSA's conclusions were supported by substantial evidence" in the record (emphasis omitted)).  (*See* Doc. 16 at 2.)  In *Bonet*, the Second Circuit explained that, although "reasonable minds [might] disagree as to whether [the claimant] is disabled," if the ALJ considered the relevant factors and "simply reached a conclusion, supported by substantial evidence, with which [the claimant] does not agree," there is no cause to remand.  523 F. App'x at 59.

Here, as in *Bonet*, the ALJ's decision reflects that the ALJ considered the relevant factors in analyzing the medical opinions and determining Davis's RFC; and the ALJ's findings are supported by substantial evidence, including—as discussed in the decision—the opinions of medical expert psychiatrist Dr. Strahl; treating physician Dr. Jennifer Lager; examining psychologists Dr. Craig Knapp, Dr. Joseph Rainville, and Dr. Steven Mann; and nonexamining agency consultants psychologist Dr. Thomas Reilly and psychiatrist Dr. Edward Schwartzreich. (*See* AR 2357–61.) The ALJ's conclusions are also supported by other evidence, including objective findings and recorded statements contained in treatment notes of medical providers; Davis's own statements regarding his daily activities and ability to work during the relevant period; and Davis's and his wife's testimony at multiple administrative hearings regarding the same. In determining Davis's RFC, the ALJ clearly considered all this evidence as a whole, as the regulations require. *See* 20 C.F.R. § 404.1545(a)(1) ("We will assess your [RFC] based on all the relevant evidence in your case record."); *see also State of N.Y. ex rel. Bodnar v. Sec'y of Health & Human Servs.*, 903 F.2d 122, 126 (2d Cir. 1990) ("When reviewing for substantial evidence, we review the record as a whole. This means that in assessing whether the evidence supporting the [Commissioner's] position is substantial, we will not look at that evidence in isolation but rather will view it in light of other evidence that detracts from it." (citation omitted).)

## A.     ALJ's Analysis of Medical (and Vocational) Opinions

The record in this case is voluminous, exceeding 3,000 pages, and includes many medical opinions.  It was within the ALJ's discretion to resolve "[g]enuine conflicts" in and among these medical opinions.  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).  The ALJ afforded "greatest weight" to the opinions of testifying psychological expert Dr. Strahl, finding that he is "an acceptable medical source" and an "expert in the area of mental disease"; he "explained his reasons" for his opinions; and his testimony is "consistent with [the] opinions of other medically acceptable sources." (AR 2361; *see* AR 3390–98.)  These are all proper factors for an ALJ to consider in evaluating a medical opinion.  *See* 20 C.F.R. § 404.1527(c)(3)–(5).  Davis asserts, however, that the medical records reviewed by Dr. Strahl "do not support the mental [RFC] he found" (Doc. 13 at 7), and that the ALJ "failed to resolve the conflicts within the opinion of . . . Dr. Strahl[] and the conflicts between [Dr. Strahl's] opinion and other [medical] opinions" (Doc. 17 at 3).  More specifically, Davis claims that the ALJ's RFC finding that Davis could have occasional interactions with coworkers and supervisors "does not comport with" Dr. Strahl's testimony that Davis had "marked" limitations in social functioning from 2003 through 2015.  (*Id.*; *see also* Doc. 13 at 8.) But the ALJ did not adopt Dr. Strahl's opinion that Davis had marked limitations in social functioning, instead finding that Davis had "a moderate level of dysfunction" in this area and citing evidence that, among other things, Davis had been married for more than 20 years, cared for his children, participated in a variety of church activities, attended a family reunion, went hiking with his family, helped a friend

move, assisted an older person learn computer skills, performed at least part-time work, and interacted appropriately with his medical providers.  (AR 2354.)

Moreover, Dr. Strahl explained in detail why he opined that Davis could have occasional interactions with coworkers and supervisors, despite his marked social limitations, and that explanation comports with the ALJ's RFC determination.  (*See* AR 2356, 2431–36.)  Specifically, Dr. Strahl pointed out that Davis had been able to work in the past, despite his personality disorder, stating: "[P]ersonality disorders rarely make it impossible for people to work.  But they do impact the type of work and the people around them they work with."  (AR 2433.)  Dr. Strahl continued:

> [M]inimizing his need to interact with others is a critical issue.  And this is what I find for him[:] the simple, routine, repetitive tasks.  He can work . . . with one or two supervisors at a time because when you appreciate that simple, routine, repetitive tasks after a short learning curve do not require much interaction with anyone because you're doing the same thing over and over, a one-, two-step type exam, you're just doing it. . . . He has to have work that is independent of other people [and can work with coworkers] no more than one third of the [time]. . . .  And in terms of working with the public, I would keep it . . . superficial. . . .  So . . . what I'm saying is . . . keep it simple.  And keep it independent.  And if vocationally there are such jobs in the market, fine.  If not, then that's the way . . . things work out.

(AR 2435–36.)  The ALJ largely adopted this RFC, finding that Davis could "perform uncomplicated tasks that typically can be learned in 30 days or less" but was "limited to incidental contact with the general public (dealing with the public is not part of his job duties)" and required "an environment where tasks are performed in a solitary manner (no tandem or team tasks)."  (AR 2356.)  Like Dr. Strahl, the ALJ explained that Davis was "able to collaborate with co[]workers and supervisors" only on "routine matters."  (*Id.*)

Dr. Strahl's opinions are consistent with other medical opinions in the record, as the ALJ noted.  For example, the ALJ correctly observed that both Dr. Strahl and psychologist Dr. Knapp opined that Davis could understand, remember, and carry out instructions in an employment setting, despite having difficulty relating to others. (AR 2357; *see* AR 306, 2434–35.)  And the ALJ accurately noted that psychologist Dr. Rainville opined that Davis had at least average intellectual abilities, which accords with Dr. Strahl's opinions.  (AR 2357–57; *see* AR 307–08.)  As the ALJ also discussed, Dr. Mann—like Dr. Strahl—found that Davis's anxiety and anti-social tendencies would not preclude him from work.  (AR 2357–59; *see* AR 862–63, 928–41.) In fact, after interviewing and evaluating Davis in December 2009, Dr. Mann opined that work would be beneficial to Davis, explaining:

> There is nothing in this examiner's evaluation of Mr. Davis that supports disability in this case.  In fact, this clinician feels strongly that Mr. Davis will benefit psychologically from reengaging vocationally [in] relevant work.  The commitment and demands of the workplace will assist Mr. Davis in moving away from his amplified disability perception, assisting him in increasing self[-]esteem and self[-]reliance.

(AR 940.)  About a month later, in January 2010, treating physician Dr. Lager agreed with this opinion, as noted by the ALJ.[1]  (AR 2359; *see* AR 945.)

Further, the ALJ accurately stated that the opinions of nonexamining agency consultants Dr. Reilly and Dr. Schwartzreich were consistent with Dr. Strahl's

---

[1]  The ALJ assigned "controlling weight" to this January 2010 opinion of Dr. Lager's.  (AR 2359.) Almost two years earlier, however, on May 7, 2008, Dr. Lager gave a contradictory opinion about Davis's ability to work, signing a form allowing for 40 hours per week of state-subsidized childcare for Davis's "lifetime," due to Davis's anxiety and mood disorder.  (AR 944; *compare with* AR 945.)  Neither the May 2008 opinion nor the January 2010 opinion contains any rationale, support, or explanation. Also noteworthy, the 2008 opinion conflicts with other evidence in the record that indicates Davis was in fact working on that date.  (*See* AR 226, 229, 395.)

opinions.  (AR 2358; *see* AR 369 ("likel[]y to have significant challenges managing interactions w[ith] general public and in contexts that demand[] frequent interaction and collaboration of effort[, but] [i]s able to manage routine interactions in contexts of reduced interaction and social stim[ulation]"), 613.)  Affording "substantial weight" to Dr. Reilly's April 2008 opinion that, among other things, Davis could manage routine interactions in the context of reduced interaction and social stimulation, the ALJ correctly stated that Dr. Reilly: "provided a rationale for his opinion," "accurately noted evidence that [Davis's] daily activities w[ere] grossly normal," "considered findings by other sources," and was "a specialist in the area of mental health." (AR 2358; *see* AR 369.)  The ALJ also afforded "substantial weight" to Dr. Reilly's more recent May 2013 opinion that Davis could manage routine and brief interactions with others, accurately explaining that Dr. Reilly again "provided reasons for his opinion after reviewing the extensive record," and appropriately recognizing that Dr. Reilly is "an expert in the area of mental disease."  (AR 2360; *see* AR 2321.)

Davis argues that the ALJ erred in giving more weight to the opinions of nonexamining agency consultants than to those of treating physicians Dr. Julie Foster and Dr. Lager and other treating providers.  (Doc. 13 at 13–14; Doc. 17 at 4.)  But the regulations permit the opinions of nonexamining consultants like Drs. Strahl, Reilly, and Schwartzreich, to override the opinions of treating physicians like Dr. Foster and Dr. Lager, when the former are more consistent with and supported by the evidence than the latter.  *See Hancock v. Barnhart*, 308 F. App'x 520, 521 (2d Cir. 2009) (opinion of nonexamining medical expert may be given more weight than opinion of

treating physician and may constitute substantial evidence in support of ALJ

determination); *see also Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he

regulations . . . accord less deference to treating physicians whose opinions are not

supported by other evidence . . . and . . . permit the opinions of nonexamining sources

to override treating sources' opinions provided they are supported by evidence in the

record." (citing *Schisler v. Sullivan*, 3 F.3d 563, 567–68 (2d Cir. 1993))); SSR 96-6p,

1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from

State agency . . . consultants . . . may be entitled to greater weight than the opinions of

treating or examining sources.").  Here, the ALJ explained her decision to give greater

weight to the agency consultant opinions, and substantial evidence supports that

decision.

Davis contends the ALJ "failed to apply the 'treating physician rule'

consistently" in her analysis of the opinions of treating physicians Dr. Lager and

Dr. Foster.  (Doc. 17 at 3.)  But the Court finds no error.  The ALJ explained that she

afforded "controlling weight" to Dr. Lager's January 2010 opinion that she agreed with

Dr. Mann's opinion because: (1) Dr. Lager was a "treating physician"; (2) the opinion is

"supported by medically acceptable clinical and laboratory diagnostic techniques"; and

(3) the opinion is "not inconsistent with other substantial evidence of record."  (AR

2359; *see* AR 945, 940.)  These three factors—the treatment relationship between

doctor and claimant/patient, the supportability of the opinion, and the consistency of

the opinion with the rest of the record—are specifically listed in the applicable

regulation, which states: "If we find that a treating source's medical opinion on the

issue(s) of the nature and severity of your impairment(s) is well[] supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 416.927(c)(2). Moreover, substantial evidence supports the ALJ's analysis, as discussed herein.

The ALJ considered these same three factors (treating relationship, supportability, and consistency), as well as other factors listed in the applicable regulation, in analyzing Dr. Foster's opinions, ultimately concluding that some are entitled to "significant weight" and others entitled to only "some weight" or "little weight." (AR 2360.) Although recognizing that Dr. Foster is a treating physician, the ALJ correctly noted that Dr. Foster is not a specialist in mental health[2] and portions of her opinions are unsupported and inconsistent with the record. (*Id.*) It is well established that, "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted). Here, as the ALJ explained, certain of Dr. Foster's opinions—including her opinion that Davis could only occasionally reach, handle, and finger—are inconsistent with other significant evidence, including the opinions of Dr. Strahl, Dr. Knapp, Dr. Rainville, Dr. Reilly, Dr. Schwartzreich, Dr. Knisely, Dr. Mann, and Dr. Lager; and thus the ALJ did not err in declining to afford

---

[2] Dr. Foster herself recognized this deficit, stating in a February 2016 letter to Davis's attorney: "Regarding [Davis's] mental and emotional abilities to work, I would defer . . . to his psychiatrist and counselor whom he sees regularly." (AR 3321.)

substantial weight to Dr. Foster's opinions. (AR 2360.) *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts"). In contrast, other opinions of Dr. Foster—including her opinions regarding Davis's ability to lift, carry, stand, walk, and sit—were not inconsistent with other medical evidence; and thus the ALJ appropriately afforded substantial weight to them. (AR 2360.) The ALJ correctly noted that Dr. Foster's diagnoses of significant attention deficit hyperactivity disorder and bipolar disorder were inconsistent with Dr. Foster's own treatment notes that repeatedly documented that Davis "was improved and even 'quite stable' on his medication regimen[]" (*id.* (quoting AR 2012); *see* AR 1791, 2260, 2336, 3293), and that Davis had a normal or mild mental status (AR 3173, 3314) and applied for work during the relevant period (AR 2232–33). *See Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) ("Because [treating physician's] medical source statement conflicted with his own treatment notes, [and the ALJ comprehensively explained the reasons for discounting the treating physician's medical source statement], the ALJ was not required to afford his opinion controlling weight.").

Davis claims the ALJ should have evaluated in more detail the opinions of Vocational Rehabilitation Counselor Gary Jaquith, Nurse Practitioner Nancy Driscoll, Nurse Practitioner Wayne Powell, Social Worker Stephen Knisely, Counselor Lynn Reardon, and Pastor/Certified Temperament Therapist Donna Santopolo. (Doc. 13 at

9–14.)  But Davis fails to identify any legal error in the ALJ's evaluation of these opinions, and there is substantial evidence to support the ALJ's analysis.  *See McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") Specifically, the ALJ appropriately afforded less weight to the opinions of these individuals for the reason that none is an "acceptable medical source."  (AR 2359.) Counselors, nurses, social workers, and pastors are not "acceptable medical sources" under the regulations, but rather, are "other sources."  20 C.F.R. § 404.1513(a), (d) (2015).[3]  As such, the opinions of these sources do not require the same special consideration given to treating source opinions under 20 C.F.R. §§ 404.1513(a)(2) and 404.1527(a)(2), (c)(2), although the ALJ should consider the same factors in evaluating these opinions as are considered in evaluating treating source opinions.  *See* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("Information from . . . other sources cannot establish the existence of a medically determinable impairment . . .[;] there must be evidence from an acceptable medical source for this purpose." (internal quotation marks omitted)); *id.* at *5 ("The fact that a medical opinion is from an acceptable medical source is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an acceptable medical source because . . . acceptable medical sources are the most qualified health care

---

[3]  Section 404.1502 was amended, effective March 27, 2017, to add as an acceptable medical source a "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice," but this change applies "only with respect to claims filed on or after March 27, 2017."  20 C.F.R. § 404.1502(a)(7) (2017) (citation omitted).  Because Davis's claim was filed well before March 27, 2017, the change does not apply to this case.

professionals." (internal quotation marks omitted)).  The Second Circuit explained that, "while the ALJ is certainly free to consider the opinions of . . . 'other sources' in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008).  Here, the ALJ did consider the opinions of Davis's counselors, nurse practitioners, social workers, and pastor; but reasonably afforded less weight to them, in part because they were not acceptable medical sources.

The ALJ also noted additional deficiencies in these "other source" opinions, properly considering the applicable regulatory factors.  For example, the ALJ accurately found that Nurse Driscoll's assertions "are not supported by any objective testing" and are inconsistent with the other medical evidence.[4]  (AR 2358; *see* AR 865.) *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.  The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").  And the ALJ correctly noted that Social Worker Knisely's opinion "acknowledged his own limited expertise in assessing work capacity[,] . . . admit[ing] that his work with [Davis] did not involve observing him in work or social settings."  (AR 2359; *see* 3319.)

---

[4]  Of note, Nurse Driscoll recorded in a June 2009 treatment note that Davis told her he was a "Daddy Daycare" for his two- and nine-year-old daughters, given his wife's job as a reporter.  (AR 1458.) The treatment note also states that Davis was "g[oo]d electronically," "build[ing] and repair[ing] computer[s]."  (*Id.*)  A treatment note from a few months later (October 2009) indicates that Davis and his wife had found a new daycare for their daughters.  (AR 1484.)

The ALJ also recognized that Nurse Powell and Counselor Reardon assigned low Global Assessment of Functioning (GAF) scores to Davis, but correctly stated that these scores were "based upon one particular moment in t[ime]" and were thus "mere snapshot[s] of [Davis's] situation on that date"; and that these scores are no longer used under the Diagnostic and Statistical Manual of Mental Disorders. (AR 2359.) *See Parker v. Comm'r of Soc. Sec. Admin.*, Civil Action No. 2:10–CV–195, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score.")). With respect to Vocational Counselor Jaquith's February 2008 opinion that Davis had "many [mental] barriers" resulting in an inability to work (AR 146), the ALJ accurately stated that the same document containing that opinion also indicates that Davis was working in February 2008, and although that job would soon end, the reason given was because it was seasonal, not due to any of Davis's impairments. (AR 2354; *see* AR 146).

In sum, the ALJ properly considered the medical and vocational opinions, and gave adequate reasons, supported by substantial evidence, for her allocation of weight thereto.

**B.      ALJ's RFC Determination**

Apart from his challenge to the ALJ's analysis of the medical and vocational opinions, Davis challenges the ALJ's mental RFC findings that Davis could collaborate with coworkers and supervisors on routine matters, and could engage in "incidental contact" with the general public. (AR 2356; *see* Doc. 13 at 15–18.) As discussed

herein, however, substantial evidence—including the medical opinion evidence discussed above—supports these findings. Davis also challenges the ALJ's physical RFC findings, arguing that the RFC should have accounted for Davis's CTS, deficits in fine motor skills, and limited upper extremity functioning. (Doc. 13 at 15.) But the ALJ's decision explicitly considers each of these issues and recognizes that Davis's CTS was a severe impairment. (*See* AR 2349, 2352, 2357.) The ALJ adequately explained her decision not to assign significant limitations to Davis due to his CTS, stating:

> [Davis] is not unable to perform fine and gross movements effectively. In fact, [he] has been able to maintain significant activities with his upper extremities. In November 2014, he reported that he was able to perform household chores and look after his children. In March 2015, he reported that he was able to move furniture and wash dishes. In April 2015, he reported that he did the food shopping. In July 2015, he was swimming and diving. In December 2015, he reported keeping the family house in order and using a computer. In February 2016, testing revealed [his] ability to frequently lift/carry 25 pounds and to occasionally lift/carry 50 pounds. [He] was also able to use both upper extremities to occasionally reach overhead, frequently perform a near reach[,] and occasionally perform a far reach.

(AR 2352 (citations omitted).) Substantial evidence, cited in the ALJ's decision and throughout this Opinion and Order, supports these findings. (*See, e.g.*, AR 3127, 3133, 3158, 3169, 3309, 3329.)

Later in her decision, the ALJ explained that the record does not show that Davis had a "prolonged problem" with his left upper extremity:

> Dr. Stein described [Davis] as asymptomatic in April 2015. In April 2016, EMG testing was diagnostic for left [CTS], but there are no records of ongoing complaints or treatment in the 8[] months since that testing was performed. . . . [I]n November 2006, more than three years after his alleged onset date, [Davis] described a variety of activities to consultative

psychologist Dr. Knapp. He admitted that he was able to get his daughter ready for school, work on his computer, cook, shop[,] and perform household chores. In June 2007, he was working and he even described standing 8–10 hours per day. . . . [H]e reported that he could spend hours working on his computer. . . . In his July 2008 Function Report, [Davis] also admitted to many activities including shopping, cooking[,] and doing laundry. He even admitted to playing on[]line games "all the time."

(AR 2357 (citations omitted).) Again, substantial evidence, cited in the ALJ's decision and throughout this Opinion and Order, supports these findings. (*See, e.g.*, AR 186, 307–08, 325, 334, 337, 1545, 2405, 3101.)

The Court finds no error in the ALJ's determination of Davis's RFC.

## II.    ALJ's Assessment of Davis's Credibility

Davis also contends that the ALJ erred in her assessment of his credibility, i.e., in her finding that Davis's "statements concerning the intensity, persistence[,] and limiting effect of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 2357.) (*See* Doc. 13 at 18–20.) It is the function of the Commissioner, not the court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *see Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010). If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984); *see Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009). "When evaluating the credibility of an individual's statements, the adjudicator must consider

the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).

The ALJ clearly considered the entire case record in assessing Davis's credibility, and adequately explained the reasons for her finding that Davis had diminished credibility.  These reasons include: (1) the wide range of activities in which Davis engaged during the alleged disability period, including caring for his children, doing household chores, hiking, swimming, attending Bible study group, and working on computers (AR 2353, 2355, 2357; *see, e.g.*, AR 186, 302, 307–08, 325, 334, 337, 1403, 1545, 2397, 2399, 2405, 3101, 3127, 3133, 3158, 3169, 3309, 3329); (2) the limited treatment sought by Davis at times during the alleged disability period (AR 2357); (3) Davis's employment after the disability onset date (AR 2353, 2357; *see* AR 146, 229, 334); and (4) independent statements made by two examining psychologists that Davis was exaggerating his symptoms (AR 2357; *see* AR 307–09 (Dr. Rainville reporting that Davis attained invalid responses to psychological testing due to malingering),[5] 940 (Dr. Mann noting that psychological testing was invalid due to exaggerated claims of disability); *see also* AR 1599 (Davis informing a mental health counselor that, although he is "uncomfortable with the fact that he does not bring any income in[]to [his] household," "his attorney has told him not to work" given the pendency of his disability claim)).  These reasons are supported by substantial evidence, and it was legally proper for the ALJ to consider them as part of her credibility determination.

---

[5] Dr. Rainville further stated that Davis "is almost entirely illness[-]focused and preoccupied," and opined that Davis "most needed" "a position where [he] works at his level of skills and not at mundane employments that trigger his boredom."  (AR 309.)

*See, e.g.*, 20 C.F.R. § 404.1529(c)(3)(i) (listing daily activities as a relevant consideration in assessing credibility); *Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (ALJ properly considered claimant's daily activities, such as walking her dog and cleaning her house, in support of RFC determination); *Navan v. Astrue*, 303 F. App'x 18, 20 (2d Cir. 2008) ("claims of total disability were undermined by [claimant's] failure to seek regular treatment for his allegedly disabling condition"); 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that [the claimant] could perform some work cuts against his claim that he was totally disabled.").

Given the limited scope of judicial review on this issue, there is no reason to disturb the ALJ's assessment of Davis's credibility. Davis asserts that the ALJ "pointed to limited parts of the record" in defending her credibility assessment. (Doc. 13 at 19.) But the ALJ is not obligated to discuss every piece of evidence in the record, or even "every reason justifying [her] decision," especially in a case like this, where the record exceeds 3,000 pages. *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." (internal quotation marks omitted)). Moreover, at the same time as arguing that the ALJ should have found Davis credible and thus should have relied on Davis's self-reporting, Davis conflictingly asserts that the ALJ should not have relied on Davis's self-reporting because he gave "inaccurate reports" about his ability to do things like take care of his children. (Doc. 13 at 19.)

The ALJ was entitled to assess Davis's credibility based on her review of the record; and the ALJ's decision clearly indicates that she reviewed the entire record and was aware that Davis's statements were sometimes not entirely true.

## III.  Appeals Council Remand Order

Finally, Davis argues that the ALJ failed to follow the Appeals Council's June 3, 2015 Remand Order.  (Doc. 13 at 3–5; Doc. 17 at 5–6.)  In relevant part, that Order instructed the ALJ to: (a) give further consideration to the treating and non-treating source opinions, including particularly the opinion of Nurse Driscoll; (b) further evaluate Davis's mental impairments in accordance with the special technique provided in 20 C.F.R. §§ 404.1520a and 1416.920a; and (c) give further consideration to Davis's RFC.  (AR 2466.)

Davis claims the ALJ "repeated the errors of prior ALJ decisions by relying on several third-party statements in the record, which erroneously state[] that Davis was the primary care[]taker of his children," when in fact, "many of these records are based on [Davis's own] inaccurate self-report," as Davis "frequently mis[]represented" his role in caring for his kids.  (Doc. 13 at 4.)  The Court finds no error.  There are indeed many records indicating that Davis was responsible for taking care of his children at times during the relevant period.  (*See, e.g.*, AR 307, 729, 1585, 1587, 1768, 1945, 3169, 3194.)  There are also records—principally, the testimony of Davis's wife at multiple administrative hearings and documents indicating that the family received subsidized daycare—indicating that Davis was unable to care for his children during the same period.  (*See, e.g.*, AR 2393, 2500–01, 2678.)  The ALJ's decision reflects that she was

aware of this conflict in the evidence and that she reviewed the evidence on both sides; the decision explicitly notes that Davis and his wife applied for subsidized childcare. (AR 2354.) It is the job of the ALJ to resolve evidentiary conflicts like this, *see Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("it is up to the agency, and not this court, to weigh the conflicting evidence in the record"); and Davis has pointed to no error. To the contrary, the ALJ cited to substantial evidence supporting her findings on this issue. (AR 2352–55, 2357.)

Moreover, despite Davis's arguments to the contrary, the ALJ provided a detailed discussion about Davis's mental impairments and functioning, in accordance with the special technique provided in the regulations and in compliance with the terms of the Remand Order. (*See* AR 2352–55.) Furthermore, as noted above, the ALJ adequately explained her decision to give "little weight" to the opinions of Nurse Driscoll, stating that Driscoll is not an acceptable medical source, and that her opinions are unsupported by objective testing and inconsistent with other medical evidence. (AR 2358.) In fact, Driscoll did not cite any objective findings to support her opinions (*see* AR 865–68); and Driscoll's findings that Davis had four or more episodes of decompensation in a twelve-month period and a long-term memory impairment (AR 866–67) are not supported in the record, which instead reflects only one period of decompensation (*see* AR 1622–33) and no evidence of a memory impairment. The Remand Order did not mandate that the ALJ afford any particular weight to Driscoll's opinions; rather, the Order merely required the ALJ to "further evaluat[e]" them because the prior ALJ's decision had "not identif[ied] or address[ed] the[m]."

(AR 2466.)  The ALJ followed this instruction and made no error in her analysis of the relevant opinions.

## Conclusion

For these reasons, after reviewing the ALJ's January 3, 2017 decision and the voluminous record filed in support of Davis's claim, the Court concludes that the ALJ made no legal error and that substantial evidence supports the decision.  Accordingly, the Court DENIES Davis's motion (Doc. 13), GRANTS the Commissioner's motion (Doc. 16), and AFFIRMS the decision of the Commissioner.  The Clerk shall enter judgment on behalf of the Commissioner.

Dated at Burlington, in the District of Vermont, this 26th day of February 2018.

/s/ John M. Conroy_____
John M. Conroy
United States Magistrate Judge